**Guy H. BRISCOE**

v.

**The UNITED STATES.**

**No. 224–66.**

United States Court of Claims.

May 14, 1971.

defendant's counterclaim is, of course, allowed.

J. Michael Gottesman, Washington, D. C., attorney of record, for plaintiff.

Judith Ann Yannello, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant. Mary M. Schroeder, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT I AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNT I AND A COUNTERCLAIM, AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT II

PER CURIAM:

As this case comes before us, it involves two separate counts and two coun-

terclaims. Count I (which comprises the original petition) and the counterclaims were the subject of an opinion and recommendation by Trial Commissioner Mastin G. White. Both parties have sought review of aspects of the commissioner's report. Count II was added to the petition in October 1969, by leave of the court, very shortly before the commissioner filed his report on the claim in the original petition (and the counterclaims). Defendant has moved for summary judgment on Count II. Desiring that this old case be disposed of as soon as possible, we ordered that that motion be argued together with the requests for review on Count I. Oral argument has now been had. We adopt the commissioner's recommendation on Count I and the counterclaims and, with some changes in regard to Count I, also adopt his opinion. On Count II we grant the defendant's motion for summary judgment dismissing that claim. Under Part I, *infra*, we set forth the commissioner's opinion as modified by the court. In Part II, we discuss Count II of the amended petition.

## I—COUNT I AND COUNTERCLAIMS

Trial Commissioner White's opinion, as modified by the court, is as follows:

This case arose in connection with the performance by the plaintiff of Contract No. 12–10–410–6619 ("the contract") between the plaintiff and the defendant (represented by the Soil Conservation Service, Department of Agriculture).

The parties have filed cross-motions for summary judgment on the count (Count I) set out in the plaintiff's original petition—*i. e.*, on the petition as it stood prior to the amendment of October 3, 1969—and the defendant has also moved for summary judgment on the second counterclaim asserted in the defendant's answer to the original petition.

### Introduction

The contract called for the construction by the plaintiff of an earthen dam across a creek located in Runnels County, Texas, and within the Middle Colorado River Watershed. It contained the standard "changed conditions" and "disputes" provisions customarily found in Government construction contracts. The plaintiff was to receive $139,351.80 from the defendant for his work under the contract.

Mrs. Dora Spreen, rather than the defendant, owned the land on which were located both the dam site and the borrow area from which the earth fill for the dam was to be taken. Mrs. Spreen had granted to the Central Colorado Soil Conservation District—with which the Soil Conservation Service was cooperating in a conservation program—an easement which authorized the placement of the dam at the particular site and the use of earth from the borrow area as fill in the construction of the dam. The borrow area, as depicted on the contract drawings, was adjacent to, and upstream from, the dam site.

After the plaintiff received a copy of the invitation for bids on the contract, and before the plaintiff's bid was prepared, a representative of the plaintiff visited the site of the proposed project. He was interested in (among other things) the availability of water for construction purposes, since the use of water is essential for the proper compaction of the earth fill in an earthen dam. The plaintiff's representative noted that the creek was then dry at the project site, except that there was a natural basin or water hole within the limits of the borrow area, as shown on the contract drawings, and this natural basin contained water. (The natural basin had been created in a limestone formation which constituted the bottom of the creek at one point, whereas the creek bottom elsewhere consisted of gravelly material mixed with clay and would not hold water when the creek stopped running in dry weather.)

In preparing his bid on the contract, and in entering into the contract, the plaintiff believed that the water in the natural basin previously mentioned would be available for his use in connec-

tion with the construction of the dam. The plaintiff's bid was based in part upon this belief.

The plaintiff was the lowest responsible bidder on the contract, and the contract was awarded to the plaintiff on April 9, 1964. It expressly placed upon the plaintiff the responsibility for providing and maintaining an adequate supply of water for construction purposes.

On or about April 20, 1964, the plaintiff was told by the landowner's representative and lessee that, in the construction of the dam, the plaintiff could not use water from the natural basin within the limits of the borrow area. The landowner's representative and lessee reiterated this position on subsequent occasions.

The plaintiff filed a suit in the District Court of Runnels County, Texas, against the landowner's representative and lessee in an attempt to establish the plaintiff's right to use the water in the natural basin for construction purposes. That case was not tried until August 1, 1964, and the plaintiff's objective of obtaining water for the construction of the dam was not accomplished as a result of the litigation.

In the meantime, the plaintiff commenced the work under the contract. He dug a sump in the creek bed at a point upstream from the natural basin, and through seepage obtained some water for construction purposes. On July 2, 1964, however, the plaintiff was compelled to discontinue operations temporarily because of a lack of water for the compaction of earth in the earthen dam. The plaintiff then began to make serious efforts to obtain water from sources other than the water hole within the borrow area, and he expended a substantial amount of money in the quest for water. Although some water was obtained as a result of these efforts, the plaintiff did not have an adequate water supply with which to carry on uninterrupted construction operations until ample rains fell in August along the watershed of the creek and caused the creek to flow. This ended the plaintiff's water problem.

The plaintiff filed with the contracting officer a claim for an increase in the contract price to compensate the plaintiff for the extra costs incurred because of the unavailability of the water in the natural basin for construction purposes. The contracting officer denied the plaintiff's claim, whereupon the plaintiff took an appeal under the "disputes" provision of the contract to the Department of Agriculture Board of Contract Appeals ("the Board"), which had been designated to act for the Secretary of Agriculture in the disposition of contract appeals.

The attorney representing the Government in the administrative proceedings filed with the Board a motion to dismiss the plaintiff's appeal, on the ground that the Board "has no jurisdiction in this action" because the "appeal involves an alleged misrepresentation, which is a breach of contract." The plaintiff vigorously opposed the motion to dismiss, filing an 18-page brief in which he contended that the Board had jurisdiction to consider his claim and make a determination with respect to it. The Board overruled the Government attorney's motion.

On the basis of the record that was made at a hearing held in Temple, Texas, during February of 1965, the Board rendered on July 29, 1965, a decision which contained factual findings and determined that the unexpected (to the plaintiff) refusal of the landowner to permit the use of the water in the natural basin for construction purposes constituted a changed condition, which entitled the plaintiff to an equitable adjustment upward in the contract price under the "changed conditions" provision of the contract. Later, after the parties had submitted additional documentary evidence to the Board, the Board rendered a supplemental decision on December 22, 1965, which allowed the plaintiff an equitable adjustment upward of $1,622.31 in the contract price.

The present action in the Court of Claims was instituted by the plaintiff on June 27, 1966.

### The "Changed Condition" Issue

■ The primary contention made by the plaintiff in his motion for summary judgment is the rather surprising one that the Board was acting beyond the scope of its jurisdiction when it determined that the plaintiff had encountered a changed condition. Specifically, the plaintiff makes the following statement on this point in the brief supporting his motion for summary judgment:

> The Board made a finding of changed condition, * * * and such action is not within the power of the Board. * * *

It appears from the plaintiff's brief that his purpose in arguing that the Board lacked jurisdiction is to lay a predicate for a further contention to the effect that certain factual determinations made by the Board in its decision of July 29, 1965, are not entitled to finality under the first section under the Wunderlich Act (41 U.S.C. § 321), even though they may be supported by substantial evidence and not fraudulent, capricious, etc.

One answer to the plaintiff's present contention that the Board lacked power to render its decision of July 29, 1965, is that the plaintiff and the defendant, in the "changed conditions" and "disputes" provisions of the contract, jointly conferred on the Board (as the representative of the Secretary of Agriculture for the determination of contract appeals) jurisdiction to determine in appellate proceedings whether the plaintiff encountered changed conditions in the performance of the work under the contract and, if so, to determine the amount of the equitable adjustment which the plaintiff should receive.

In the hearing before the Board, plaintiff contended that the failure of the Government to notify him of the need to protect the waterhole until after the contract was awarded constituted a changed condition and also misrepresentation, which amounted to a breach of contract. The facts with respect to both of the contentions were fully developed before the Board and it made findings thereon. After the hearing was completed but before the Board made its decision, plaintiff, in apparent abandonment of his claim of a changed condition, devoted most of his argument to the claim for breach of contract, based on misrepresentation. Plaintiff vigorously opposed the contention of the Government attorney that the Board lacked jurisdiction of such a breach of contract claim, and in his moving and reply brief to the Board asserted that the Board had the right and authority to make a determination of the facts on the breach of contract claim and to recommend to the Comptroller General that the Government was liable to the plaintiff for the purpose of arriving at a settlement of the dispute. In this connection, plaintiff's reply brief to the Board stated:

> This does not mean that the Board has jurisdiction in the sense that its findings and conclusions would be conclusive, rather, its simply means that since the administrative agency has authority to settle a dispute such as that now involved it surely must have the authority, through its Board of Contract Appeals, to make a determination of the facts necessary to such a settlement.

In view of the circumstances stated, the defendant contends that plaintiff is now estopped from contending that the Board lacked jurisdiction to render the decision in which it made findings on plaintiff's claim and determined that plaintiff had encountered a changed condition. We find it unnecessary to decide the estoppel issue because, for the reasons hereinafter set out, we conclude that the Board correctly determined that plaintiff was entitled to an equitable adjustment as a result of a changed condition. There is no doubt that the Board had jurisdiction to render such a decision.

The plaintiff's original petition presented two alternative theories for recovery, one being that the defendant breached the contract by means of misrepresentations to the plaintiff and the withholding of significant information from

the plaintiff, which misled the plaintiff into believing that the water in the natural basin previously mentioned could be used by the plaintiff for construction purposes, and the other being that the unavailability of the water in the natural basin constituted a changed condition which entitled the plaintiff to a much larger equitable adjustment in the contract price than the sum of $1,622.31 which the Board allowed the plaintiff in its supplemental decision of December 22, 1965. The plaintiff filed a motion for a trial *de novo* in this court, and the defendant opposed the motion on the ground that the Board had considered the same claim of the plaintiff under the "changed conditions" and "disputes" provisions of the contract, and, therefore, that the case was one for judicial review of the Board's decision under the provisions of the Wunderlich Act.

On June 27, 1968, the commissioner issued an order which, in paragraph 1, denied the plaintiff's request for a trial *de novo* and, in paragraph 2, directed the plaintiff to proceed by filing within 30 days a motion for summary judgment pursuant to the rules governing Wunderlich Act review cases. The plaintiff did not seek a review by the court of the portion of the commissioner's order which overruled his request for a trial *de novo*.

For the several reasons previously stated in this part of the opinion, it must be concluded that the Board was acting within the scope of its jurisdiction when it considered the plaintiff's claim and decided that the plaintiff had encountered a changed condition which entitled him to an equitable adjustment upward in the contract price. Consequently, the factual determinations contained in the Board's decisions of July 29 and December 22, 1965, are entitled to finality in the present judicial proceeding if they meet the standards prescribed in the first section of the Wunderlich Act (41 U.S.C. § 321).

### The "Waiver" Issue

■ The defendant contended in the first counterclaim which it filed as part of the original answer that the Board

ered as a matter of law in concluding that the facts found by the Board were sufficient to establish that the plaintiff encountered a changed condition. The first counterclaim demanded "that the plaintiff refund the award of $1,622.31 made by the * * * Board * * *."

The plaintiff did not file a reply to the counterclaim mentioned in the preceding paragraph, as required by former Rules 10(a) and 20(a) (1) [now Rules 31(a) and 38(a) (1)]. Furthermore, in his motion for summary judgment and supporting brief, the plaintiff did not question the right of the defendant to file a counterclaim attacking the decision of its own Board as being incorrect from the legal standpoint. *Cf.* C. J. Langenfelder & Son, Inc. v. United States, 341 F.2d 600, 607–608, 169 Ct.Cl. 465, 476–479 (1965).

However, in the defendant's cross-motion for summary judgment and supporting brief, the defendant does not ask for a judgment on its first counterclaim. Instead, the defendant impliedly concedes (particularly on page 5 and in footnote 1 on page 29 of its brief) the right of the plaintiff to receive the equitable adjustment in the amount of $1,-622.31 which was awarded to the plaintiff by the Board under the "changed conditions" provision of the contract.

Therefore, the defendant has waived the cause of action which it endeavored to state in its first counterclaim.

This leaves outstanding the Board's decision of July 29, 1965, to the effect that the plaintiff, during the progress of the work under the contract, encountered a changed condition which entitled the plaintiff to an equitable adjustment in the contract price under the "changed conditions" provision of the contract. Accordingly, it is not necessary for the court to pass upon the correctness or incorrectness of the Board's conclusion, from the legal standpoint.

### The "Misrepresentation" Issue

As an alternative ground for recovery, the plaintiff alleged in the original peti-

tion that, in connection with the granting by Mrs. Dora Spreen of the easement for the construction of the dam with which we are concerned, Marvin Daniel, an employee of the defendant's Soil Conservation Service, represented to Mrs. Spreen's agent, Fred Spreen, that the water within the natural basin previously mentioned would not be disturbed during the construction period; that when Don McCoy, a representative of the plaintiff, visited the project site prior to the submission of the plaintiff's bid, he discussed with representatives of the Soil Conservation Service the availability of the water in the natural basin for construction purposes, and was led to believe that such water would be available to the contractor for construction purposes; and that the Soil Conservation Service, in violation of its obligation to a prospective bidder, willfully and intentionally withheld from Mr. McCoy, the plaintiff's representative, information concerning the existence of the agreement previously made between the Soil Conservation Service and the landowner to the effect that the water in the natural basin would be excluded from the easement.

■ With respect to the plaintiff's allegation concerning an overt misrepresentation by the Soil Conservation Service to the plaintiff's representative— i. e., that when Don McCoy, the plaintiff's representative, visited the project site during the course of his prebid investigation, he was led to believe by representatives of the Soil Conservation Service that the water in the natural basin would be available to the contractor for construction purposes—the Board found in its decision of July 29, 1965, that the Soil Conservation Service did not represent to Mr. McCoy that the contractor would have the right to use the water in the natural basin for construction purposes. This finding is amply supported by substantial evidence in the administrative record.

The evidence shows that on the occasion when Don McCoy, the plaintiff's representative, visited the site of the proposed project during the prebid investigation, he was shown the site by— and discussed the proposed project with —Roger Powell, an employee of the Soil Conservation Service. Both Mr. McCoy and Mr. Powell were witnesses at the hearing before the Board.

It was Mr. McCoy's testimony, with respect to the point now under consideration, that on the occasion of his visit to the job site, he noticed the water hole and expressed satisfaction that the borrow area contained a large water hole, to which Mr. Powell replied that the water hole might not be as deep as it seemed and might not have as much water in it as it appeared to contain; and that Mr. McCoy asked Mr. Powell if the latter knew of any other places where water could be obtained, and if he knew what other contractors in the area were paying for water, to which Mr. Powell replied that personnel of the Soil Conservation Service could not furnish information of that sort to bidders, although Mr. Powell did mention the Colorado River as being a sure and permanent source of water, and indicated the distance between the river and the site of the proposed project.

Mr. Powell testified that he did not recall any discussion with Mr. McCoy about the water hole within the limits of the proposed borrow area; that Mr. McCoy did ask Mr. Powell if the latter knew of any sources of water, to which Mr. Powell replied that it was the contractor's responsibility, and not that of the Soil Conservation Service, to secure and maintain an adequate supply of water; and that Mr. Powell went on to say that the only sure source of water which he knew about was the Colorado River, located approximately 7½ miles from the proposed job site.

Thus, it is clear from the evidence in the administrative record that Mr. McCoy, during the prebid investigation which he made on behalf of the plaintiff, was not misled by anything which Mr. Powell said into believing the contractor would have the right to use the water

in the natural basin for construction purposes.

Turning now to the plaintiff's allegation concerning the alleged withholding by the Soil Conservation Service from the plaintiff of information relative to a prior agreement between the Soil Conservation Service and the landowner that the water within the natural basin would not be used in connection with the construction of the dam, the crucial point here is the nature of the agreement between the Soil Conservation Service and the landowner with respect to the water hole at the project site.

The Board found in its decision of July 29, 1965, that the Soil Conservation Service made an informal agreement with the landowner to protect the natural basin from destruction during the process of constructing the dam, but that this agreement did not concern itself with the question of whether the landowner or the contractor would have the right to control the use of the water in the basin during the construction process. This factual finding is supported by substantial evidence in the administrative record.

The evidence shows that the negotiations for the easement to permit the construction of the dam on Mrs. Dora Spreen's land were conducted on behalf of the Soil Conservation Service by Marvin Daniel, on behalf of the Central Colorado Soil Conservation District by Hayden Mercer, and on behalf of Mrs. Spreen by her stepson, Fred Spreen, who was a livestock rancher and the lessee of Mrs. Dora Spreen's land on which it was proposed to construct the conservation project. Messrs. Daniel and Mercer testified at the hearing before the Board, and testimony which Mr. Spreen gave before the District Court of Runnels County, Texas, in the case of Briscoe v. Spreen, No. 7519, was incorporated by reference in the administrative record.

Marvin Daniel testified regarding several conferences with Fred Spreen during the period which began in July 1962 and extended into May 1963. The gist of Mr. Daniel's testimony was that Mr. Spreen was concerned over the maintenance of a permanent source of water on the property; that, according to Mr. Spreen, the natural basin was the only water hole on the property which would hold water for any substantial period of time after the creek stopped running in dry weather; that Mr. Spreen was doubtful as to whether the structure which the Soil Conservation Service proposed to construct would hold water; that Mr. Spreen wanted the natural basin to be protected against destruction until he could be sure that the new structure would actually hold water; that Mr. Spreen did not indicate a desire to keep the water in the natural basin for his own exclusive use during the construction process; and that on one occasion Mr. Spreen inquired as to who would control the use of the water in the natural basin during the process of constructing the dam, and was informed that this would be a matter to be worked out between Mr. Spreen and the contractor.

Hayden Mercer testified that Mr. Spreen requested that the natural basin be protected from destruction during the process of constructing the dam, until he could determine whether the proposed structure would hold water; that on one occasion Mr. Spreen asked what would happen to the water in the natural basin during the construction process, and was told that this would be a matter to be determined between Mr. Spreen and the contractor; and that Mr. Spreen was never told by anyone in the presence of the witness that the Government would protect the water in the water hole against use by the contractor.

Fred Spreen's testimony was to the effect that it was agreed between himself and Messrs. Daniel and Mercer that the natural basin ("the hole," to quote Mr. Spreen) would not be disturbed during the construction process. With respect to the water in the basin, Mr. Spreen testified that there seemed to be some uncertainty as to who would have the right to control the use of the water

during the construction process; that he thought he would have such right; and that the persons who were negotiating with him for the easement indicated that it would probably be necessary for him and the contractor "to make some kind of deal about it some way."

On the basis of the testimony of the persons who were involved in the negotiations relative to the granting of the easement by the landowner for the construction of the project, it is plain that the Board was justified in finding that the agreement between the Soil Conservation Service and the landowner concerning the water hole related only to the preservation of the basin itself from destruction during the process of constructing the dam, and was not an agreement by the Soil Conservation Service that the contractor would be prevented from using the water in the natural basin for construction purposes. Consequently, the plaintiff's allegations with respect to the withholding by the Soil Conservation Service of significant information from the plaintiff's representative during the prebid investigation do not find substantial support in the evidence.

The evidence in the administrative record shows that the Soil Conservation Service was not responsible for the denial to the plaintiff of the use of the water in the natural basin for construction purposes.

The evidence in the administrative record does show that the Soil Conservation Service, in accordance with its informal agreement with Mr. Spreen, instructed the plaintiff—after the contract was entered into and before the notice to proceed with the work under the contract was issued—that he was not to disturb the natural basin during the process of removing fill from the borrow area for the construction of the dam. However,

the evidence does not establish that this particular directive interfered substantially with the plaintiff in the performance of the work under the contract.

*The "Equitable Adjustment" Issue*

■ The plaintiff was entitled to an equitable adjustment in the contract price sufficient to reimburse him for the difference between what it actually cost him to do the work and what it would have cost him if the unforeseen condition —*i. e.*, the unavailability of the water in the natural basin for construction purposes—had not been encountered. Tobin Quarries, Inc. v. United States, 84 F. Supp. 1021, 1022–1023, 114 Ct.Cl. 286, 334 (1949); Fehlhaber Corp. v. United States, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 585, cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957).

In its supplemental decision of December 22, 1965, the Board found that "the increased cost of performing work under the changed condition" amounted to $3,-695.80; that the cost to the plaintiff of attempting to develop other sources of water totaled $8,834.57; that the plaintiff's overhead was 5.4 percent; and that a profit of 10 percent was equitable under the circumstances.

The plaintiff, in his motion for summary judgment and supporting brief, does not question the correctness of the Board's figures, as summarized in the preceding paragraph.[1]

The plaintiff does question, however, the correctness of a related finding by the Board to the effect that if the plaintiff had exercised reasonable diligence in developing other sources of water to be used for construction purposes, the cost figures of $3,695.80 and $8,534.57 previously referred to would have been reduced by two-thirds.

1. The plaintiff did make a general statement on page 27 of his brief to the effect that the Board's determination regarding the extent of the delay that was attributable to the lack of water for construction purposes "must be found to be not substantially supported by the evidence." However, the plaintiff did not, as required by former Rule 96(b) (3) (iii) [now Rule 163(b) (3). (iii)], cite any portions of the administrative record as refuting the Board's finding.

The Board apparently believed that when the plaintiff first learned on or about April 20, 1964, that the landowner's representative and lessee was taking the position that the plaintiff did not have the right to use the water in the natural basin for construction purposes, the plaintiff should promptly have taken the steps which he subsequently took after July 2, 1964—i. e., the construction of adequate coffer dams upstream from the dam site to impound the surface flow of water resulting from rains (the evidence shows that several inches of rain fell in the area during the month of April), and the drilling of a well.

■■ Testimony presented on behalf of the plaintiff at the administrative hearing on the issue of delay in developing alternative sources of water to be used for construction purposes was to the effect that the plaintiff still believed up until July 2, 1964, that he had the legal right to use the water in the natural basin for construction purposes, and that he would actually obtain the use of such water. Irrespective of whether, in view of the plaintiff's explanation, the Board was correct in believing that the plaintiff did not act with reasonable diligence in attempting to develop other sources of water for construction purposes during the period between April 20 and July 2, 1964, the Board's determination that action on the plaintiff's part prior to July 2, 1964, would have reduced the cost figures of $3,695.80 and $8,534.57 by two-thirds is arbitrary and erroneous since the Board selected that ratio of two-thirds on a totally incorrect premise, i. e., that in making an equitable adjustment for a condition found to be changed, it is proper to allocate "blame" or fault for the changed condition between the contractor and the Government. Once it has been decided that a condition comes under the changed conditions clause, and the issue becomes solely one of the amount of the equitable adjustment, the matter of pre-contract blame, fault, or responsibility is no longer relevant. At that stage, it is incorrect to reduce the contractor's award because,

pre-bid or pre-contract, he may not have made the investigation he should. *Cf.* Foster Constr. C.A. v. United States, 435 F.2d 873, 881, 193 Ct.Cl. ——, —— (Dec. 1970). The proper amount for the equitable adjustment does not encompass that factor, but nevertheless the Board concluded here, "as a part of its responsibility to provide an equitable adjustment", "that [only] ⅓ of the *responsibility for occurrence of the changed condition* should be attributed to the Government" (emphasis supplied). This was legal error which vitiates the proportionate allocation the Board used in its calculation of the equitable adjustment.

The plaintiff also questions the correctness of a conclusion by the Board to the effect that apart from the factor of an alleged lack of diligence on the plaintiff's part, a proper equitable adjustment with respect to the cost figure of $8,-534.57 would be one-seventeenth of such amount.

The Board's formula of one-seventeenth was derived from findings that the natural basin contained approximately 503,000 gallons of water on July 2, 1964, when the plaintiff temporarily discontinued operations because of the lack of water; and that 503,000 gallons represented only one-seventeenth of the total quantity of water needed by the plaintiff for construction purposes.

The Board's finding that the natural basin contained approximately 503,000 gallons of water on July 2, 1964, was based upon data assembled by a Soil Conservation Service survey party with respect to the length of the basin, its average width, and the depth of the water. The 503,000-gallon figure was inconsistent with the testimony of a witness for the plaintiff, who stated that he stepped off the dimensions of the water hole; that it was approximately 1,000 feet long; and that he estimated that it contained approximately 1½ or 1¾ million gallons of water. However, it was certainly the Board's prerogative to accept the SCS data as being more accurate

than the estimate made by the plaintiff's witness.

Also, the Board's finding that 503,000 gallons of water represented one-seventeenth of the total quantity of water needed by the plaintiff for construction purposes was consistent with evidence presented at the administrative hearing by both sides.

However, it does not follow, by any means, that if the plaintiff had been permitted to use the water in the natural basin for construction purposes, his cost figure of $8,534.57 would have been reduced by only one-seventeenth.

The figure of $8,534.57 represents the total cost to the plaintiff of attempting to develop other sources of water for construction purposes during the period between July 2, 1964, and the time in August 1964 when ample rains along the watershed of the creek caused the creek to flow and ended the plaintiff's water problem. The plaintiff contends that if he had been permitted to use the water in the natural basin, the water hole would have provided all the water he needed for construction purposes until the August rains, because water withdrawn from the pool would have been replenished from underground sources. Thus, according to the plaintiff, it would not have been necessary to expend any money for the development of a supplemental source of supply.

█ The evidence in the record shows that there was an underground movement of percolating water from upstream sources through the gravelly subsurface beneath the creek bottom and into the natural basin. Thus, it is clear that if the plaintiff had begun to take water from the natural basin and use it for construction purposes, the pool would have been replenished to some extent from underground sources. On the other hand, the evidence in the record does not warrant a finding that the rate of replenishment would have been sufficient to supply fully the plaintiff's water needs during the period between July 2, 1964, and the time of the August rains. Actually, the evidence in the record does not permit a really accurate finding to be made concerning the extent to which the pool would have been replenished from underground sources during the July-August period if water had been withdrawn from the pool for construction purposes. Under the circumstances, a finding in the nature of a "jury verdict" seems justified, to the effect that the water hole would have provided half the water needed by the plaintiff for construction purposes between July 2, 1964, and the time of the August rains, and would have reduced by one-half the plaintiff's expenditures during that period to develop other sources of supply.[2]

Accordingly, it appears that the plaintiff's equitable adjustment under the "changed conditions" provision of the contract should consist of $3,695.80 (found by the Board to represent "the increased cost of performing work under the changed condition"), plus $4,267.29 (representing one-half of the $8,534.57 found by the Board to be the cost of obtaining water for construction purposes during the period between July 2, 1964, and the August rains), or a total

2. The court accepts the foregoing portion of the trial commissioner's opinion (discussing and setting forth the "finding in the nature of a 'jury verdict'") without considering whether or not the commissioner exceeded the proper function of review under the Wunderlich Act since the defendant, in a brief filed subsequent to the commissioner's opinion, expressly consents, "in the interest of expeditiously disposing of this litigation", to "adoption of the commissioner's determination of a jury verdict in lieu of a remand to the Board for such determination", provided that the court orders no further administrative proceedings on either count in the case. As indicated *infra*, in Part II, we are dismissing Count II, and there will be no further Board proceedings. The plaintiff—in whose favor the commissioner increased the equitable adjustment—does not ask for a remand to the Board if the court should determine that the claim comes "under the contract" but finds that the Board's award was too low.

of $7,963.09, together with $430.01 (representing overhead at the rate of 5.4 percent as found by the Board) and $796.31 (representing profit at the rate of 10 percent as found by the Board), or a grand total of $9,189.41.

Thus, the plaintiff is entitled to a judgment in the amount of $9,189.41 on the cause of action stated in his original petition (Count I).

### The "Conservation Practices" Issue

■ The defendant's answer to the original petition contained a second counterclaim which alleged that on July 30, 1962, the plaintiff entered into a contract with the defendant (represented by the Soil Conservation Service) in connection with the Great Plains Conservation Program; that the contract required the plaintiff to carry out specified conservation practices on a farm owned by the plaintiff in Andrews County, Texas; that the plaintiff received cost-share payments totalling $2,496 from the defendant under the contract; that the plaintiff failed to carry out all of the practices required by the contract; that the contract was terminated by the defendant because of such failure; and that the defendant was entitled to recover the $2,496 which had been paid to the plaintiff under the terms of the contract.

The plaintiff did not file a reply to the defendant's second counterclaim, as required by former Rules 10(a) and 20(a) (1) [now Rules 31(a) and 38(a) (1)]. Furthermore, in the plaintiff's motion for summary judgment and in the briefs submitted by the plaintiff on the cross-motions for summary judgment, the plaintiff did not oppose the entry of a judgment for the defendant on its second counterclaim.

Therefore, all the allegations in the defendant's second counterclaim must be regarded as correct and as sufficient to show the defendant's entitlement to a judgment against the plaintiff in the amount of $2,496.

## II—COUNT II

Count II, added to the petition by leave of court, relates to the same contract. It purports to state a claim for breach of contract only. The assertion is that the borrow area designated by the defendant became excessively moist during the course of construction, making the fill material unsuitable for placement in the embankment, and causing increased costs to the plaintiff. The contracting officer refused to treat this excess moisture as a changed condition under the contract, or to provide a new borrow area at the defendant's expense. The specific breach alleged in the petition is "the excess moisture in the contract borrow area and the failure of the Government to furnish a new dry borrow area." The defendant has moved for summary judgment on this count.

■ Plaintiff is in the position of asserting as a breach claim under Count II a wrong that, if established, would be redressable under the changed conditions or changes clause of the contract. That was precisely the position the contractor originally took in its dealings with the contracting officer—and we think correctly so. A claim that material in a borrow area, or the condition of the borrow area, differs materially from that indicated in the contract documents, or normally to be anticipated, falls under the changed conditions article; and a claim that the defendant incorrectly required use of unsuitable borrow material can come under the changes clause. Cf., e. g., Pacific Alaska Contractors, Inc. v. United States, 436 F.2d 461, 193 Ct.Cl. —— (Jan. 1971); Wm. A. Smith Contracting Co. v. United States, 412 F.2d 1325, 188 Ct.Cl. 1062 (1969); Woodcrest Constr. v. United States, 408 F.2d 406, 187 Ct.Cl. 249 (1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970); Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968). If the same sort of claim as that stated in Count II were filed by another contractor directly in this court, without his pursuing the administrative

process, we would dismiss the petition because the claim is redressable under the contract. *Cf.* Zidell Explorations, Inc. v. United States, 427 F.2d 735, 192 Ct.Cl. 331 (1970). There is no breach claim separate from, or additional to, that claim which is remedial through the "disputes" procedure.

■ Through new counsel, plaintiff asks us, if this is so, to let him amend once again to show a claim under the contract. He would go back to the agency and exhaust there whatever remedies he has not already exhausted. We think it is far too late in this particular litigation to countenance any such last-minute change in theory. In September 1968— over two years after the institution of the present action—plaintiff filed a second petition (No. 291–68) setting up what is now Count II of the instant case as a separate breach of contract claim; it was insisted that the claim was for breach. We dismissed that second petition, arising out of the same contract as present Count I, because it attempted to split a single cause of action, but without prejudice to the possibility of amending the petition in the present case (No. 224–66) to set forth the same breach claim, if leave was allowed. The trial commissioner denied leave on the ground that it was already too late, but in October 1969 we overruled that order and granted the motion; Count II was accordingly filed at that time. In taking that action, we acted very leniently toward plaintiff's delay.[3] We think it would be an abuse of our discretion to allow still another substantial amendment in 1971, almost five years after the original petition was filed in this court, almost two years after plaintiff first sought leave to file Count II as a breach claim, over six years after plaintiff's correspondence with the contracting of-ficer on the moisture in the borrow area (correspondence which took place early in 1965), and at the end of proceedings in this court looking to the final disposition of this old case. There is no adequate reason why the substance of Count II could not and should not have been presented to us, long ago, as a claim redressable under the contract (if the plaintiff believes he has properly exhausted his administrative remedy).

This result eliminates by rendering moot the issue whether plaintiff exhausted his remedies when the case was before the Department of Agriculture. If he did, he cannot now seek Wunderlich Act review because it would split his cause of action. If he did not, that only adds another ground for dismissing his petition at the present time. Therefore, we do not pass on the parties' arguments as to the issue of exhaustion of remedies.

For these reasons, we grant defendant's motion for summary judgment on Count II.

## CONCLUSION

For the reasons stated in Part I, *supra*, the plaintiff's motion for summary judgment on Count I is allowed, and the defendant's cross-motion on this claim is denied, the plaintiff being entitled to recover $9,189.41 on this cause of action; the defendant's unopposed motion for summary judgment on its second counterclaim is allowed, the defendant being entitled to recover $2,496 on this counterclaim; the defendant's first counterclaim, being waived, is dismissed; and judgment is entered for the plaintiff in the net amount of $6,693.41 ($9,189.41 minus $2,496). For the reasons stated in Part II, *supra*, the defendant's motion for summary judgment on Count II is granted, and that count of the petition is dismissed.

---

3. In allowing the amendment to be filed, the court did not, of course, consider or decide whether the new Count II stated a valid cause of action.