Littleton, Judge,
delivered the opinion of the court:
Article 4 of the contract under which plaintiff makes its claim for an increase of 1.73 cents per cubic yard for 1,997,-161 cubic yards of material dredged, over the contract unit price of 34 cents a cubic yard, is set forth in finding 5. The pertinent provisions of the specifications prepared prior to August 4, 1938, with reference to the estimated “quantity of material” to be removed, the “physical data,” and the “character of materials” expected to be encountered are set forth in finding 4. The estimated quantity of materi al which defendant considered would have to be removed to reach the *709 depth of 32 feet shown by the contract drawings was obtained by surveys made in June 1938 (finding 6), which estimated quantity, including allowable overdepth dredging, was 2,894,500 cubic yards. It is not claimed that at that time this estimate was not accurate or reasonably so.
Paragraph 1-04 of the specifications discloses that the estimate of thé amount of material to be removed was for the purpose of obtaining “a basis for canvassing bids and for determining the amount of the consideration of the contract,” and stated that the contractor would “be required to excavate the entire quantity of material necessary to complete the work, be it more or less than the amounts above estimated.”
Paragraph 1-08 stated that “The proposed work is located within the land section of the Cape Cod Canal, and is not exposed to storm action.” This statement, of course, did not contemplate hurricane action. However, this paragraph further stated that “Failure [of the contractor] to acquaint himself with all available information concerning these conditions will not relieve the contractor of responsibility for estimating the difficulties and costs of successfully performing and completing the work as required.” The paragraph further stated that “Owing to the rapid currents, the material in the dredged cuts is eroded when it is disturbed by the process of dredging”; that on recent contracts the prescribed cuts had been secured by the contractor after the dredging of about 75% of the estimated quantity in the cut, including overdepth, and that “The quantities of materials given in the specifications are the estimated pay yardages and are 75% of the actual quantities, scow measurement, lying between the present depth and side slopes and the final depth and side slope limits, including overdepth, of the work provided for in these specifications.” Thus plaintiff was advised how the estimate of the total quantity of material to be removed had been computed. If the hurricane of September 21,1938, which neither party anticipated or could have foreseen, had not occurred, plaintiff would have dredged substantially the amounts indicated.
Paragraph 4r-01 described the character of materials, as found by defendant in June 1938, in the area to be dredged, *710 but set forth that the Government “does not guarantee that other materials will not be encountered nor that the proportions of the several materials will not vary from those indicated by the explorations.” This paragraph further stated that “If materials, structures, or obstacles of a substantially different character are encountered in the execution of the prescribed work and the cost of their removal or satisfactory treatment obviously would be, in the opinion of the contracting officer, either in excess of or less than the contract price, the contracting officer, in either alternative, will then proceed in accordance with * * * article 4 of the contract.”
The specifications were furnished plaintiff before it made its bid, in which it agreed to execute the standard form of contract, of which the specifications were to be and did become a part. Art. 4, which was the standard provision of such a contract, provided that should the contractor encounter or the Government discover, during progress of the work, “subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications,” the contracting officer would investigate, and “if he finds that they do so materially differ, the contract shall * * * be modified to provide for any increase or decrease of cost * * * resulting from such conditions.”
It will be seen from the specification provisions referred to that defendant only gave plaintiff the information which it had obtained in June 1988, and made no warranty or binding representation that plaintiff would not encounter conditions differing from those indicated as to the quantity of material; the effect of storm or hurricane action; the amount of pay yardage; or that only materials of the character described would be encountered. By these provisions it only bound itself to make an equitable adjustment if materials, structures, or obstacles of a substantially different character from those described in par. 4-01 were encountered, and that did not occur.
*711 The subsurface or latent conditions materially differing from those shown or indicated in the contract, referred to and contemplated by the first part of art. 4, were subsurface or hidden conditions which actually existed but were unknown by either party at the time the specifications and drawings were prepared and at the time the bid was submitted and accepted, and because of which unknown conditions the representation or indication in the plans and specifications would have to be substantially varied or changed in order for defendant to obtain the completed work as called for and intended by the contract.
The second part of art. 4 contemplated unknown subsurface conditions of an unusual nature and differing materially from those ordinarily encountered and generally recognized as inhering in the character of work called for, even though no representation had been made or indication given with reference thereto in the specifications or on the drawings. In other words, in order to obtain low bids and a revision of the contract price the Government agreed to pay additionally, through an equitable adjustment, for any extra work and expense ordered in addition to that originally anticipated on the basis of the plans and specifications, and the contractor agreed to a reduction of the contract price, through an equitable adjustment, for work originally contemplated but later found by defendant not necessary to be performed and ordered eliminated. We think the Government did not, by art. 4, assume an obligation to compensate plaintiff through an increase in the contract unit price for any increase in its anticipated dredging costs per cubic yard, or reduction of its anticipated profit not caused by any act or fault of the Government, but brought about and caused by a hurricane which neither party expected or could anticipate. The Arundel Corporation v. United States, 96 C. Cls. 77. The plaintiff assumed the risk of the amount of material to be dredged being reduced, as it was, by the hurricane, an act of God, just as the Government would have had to assume the risk of having to pay for an increase in the material necessary to be dredged for the same reason, as was the case in Tacoma Dredging Co. v. United States, 52 C. Cls. 447, where a flood caused an increase of 67,000 cubic yards. It is a general *712 principle of law that neither party to a contract is responsible to the other for damages through a loss occasioned as a result of an act of God, unless such an obligation is expressly assumed. Here, the contract was silent in that regard and whatever loss plaintiff may have sustained must be borne by it, and not by the Government.
Plaintiff is not entitled to recover, and the petition must, therefore, be dismissed. It is so ordered.
Whitaker, Judge; and Whaley, Chief Justice, concur.