**TURNKEY ENTERPRISES, INC.**

v.

**The UNITED STATES.**

**No. 304–76.**

United States Court of Claims.

April 18, 1979.

Before FRIEDMAN, Chief Judge, and DAVIS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on defendant's motion, filed March 9, 1979, moving that the court adopt, as the basis for its judgment in this case the recommended decision of Trial Judge Thomas J. Lydon, filed January 31, 1979, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment, plaintiff having filed no request for review thereof by the court and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby grants defendant's motion and affirms and adopts the said decision as the basis for its judgment in this case. Therefore, it is concluded that the administrative decision under review is supported by substantial evidence and is otherwise correct as a matter of law. Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

LYDON, Trial Judge: This case comes before the court on motions for summary judgment[1] which present for Wunderlich Act review (see 41 U.S.C. §§ 321–22) a decision of the Department of Agriculture Board of Contract Appeals (hereinafter the Board), AGBCA No. 365, 76–1 BCA ¶ 11,-674, denying plaintiff's claim for an equitable adjustment under the "Differing Site

William R. Morris, Menlo Park, Cal., attorney of record, for plaintiff.

Esther G. Boynton, Civil Div., Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Arlene Fine, Washington, D. C., of counsel.

1. Plaintiff filed a motion for summary judgment on September 1, 1978. The government responded thereto and also filed a cross-motion for summary judgment on October 12, 1978. While plaintiff was entitled to respond to the government's cross-motion, pursuant to Rule 52(b)(2), it has failed to do so. In its petition, plaintiff prayed for a trial de novo. It did not brief this point and it is accordingly considered abandoned. Nossen v. United States, 416 F.2d 1362, 1371, 189 Ct.Cl. 1, 18 (1969). In any event, since complete relief was available at the administrative level, plaintiff would not be entitled to a de novo trial. La Crosse Garment Mfg. Co. v. United States, 432 F.2d 1377, 1380, 193 Ct.Cl. 168, 172 (1970).

Conditions" Article (also referred to as the changed conditions clause) of a contract between plaintiff and the Forest Service, United States Department of Agriculture. Plaintiff challenges the Board's decision as being erroneous as a matter of law and as lacking substantial evidence relative to certain of its factual findings. For reasons stated herein, it is concluded that the administrative decision under review is supported by substantial evidence and is otherwise correct as a matter of law. Therefore, plaintiff's motion for summary judgment should be denied, defendant's cross-motion for summary judgment granted, and plaintiff's petition dismissed.

I

Plaintiff entered into a construction contract (No. 39–3728) dated July 31, 1970, with the Forest Service, wherein it agreed to perform certain reconstruction work on the Mad River Road located in the Six Rivers National Forest in northern California.[2] Plaintiff, as the lowest of eight bidders who responded to a solicitation issued on June 22, 1970, had been awarded the contract for $59,915 and had agreed to perform the contract work within 60 calendar days after receipt of a notice to proceed from the Forest Service.[3]

In substance, the contract was directed at repairing seven storm damaged sites. The principal work items specified in the contract were 3.5 acres of clearing and grubbing, 15,855 cubic yards of unclassified excavation, and preparation and placement of 2,730 cubic yards of filter material for use as filter blankets. The dispute in this case centers on the preparation of the filter material, the raw ingredient of which was gravel. The contract supplemental specifications (Item 215) provided in pertinent part:

> Gravel bars along Mad River within U.S. Forest land are designated as a filter material source. These are located 1.8 miles northwesterly of the project entrance.[4]

The preparation of filter material which would meet contract specifications required the use of a screening plant so as to separate out various size rock from the aggregate including separation of unwanted fines. Fines are not defined in the record. Ostensibly, fines are a powder-like substance that adhere to rock and generally must be washed away. Plaintiff's screening plant components were delivered to the gravel bar site it had selected, with Forest Service approval, on September 9, 1970.[5] Between September 9 and September 22, 1970, plaintiff was engaged, *inter alia*, in assembling the screening plant. The screening plant was operational on September 22, 1970.

2. Because of the sparse nature of the Department of Agriculture Board of Contract Appeals' (hereinafter the Board) factual findings in certain areas, it has been found necessary to supplement those facts for purposes of explanation, clarity of presentation and proper perspective. This has been done only where it is believed such supplementary facts are undisputed or uncontroverted. See *Arundel Corp. v. United States*, 515 F.2d 1116, 1118 n. 3, 207 Ct.Cl. 84, 89 n. 3 (1975); *Koppers Co. v. United States*, 405 F.2d 554, 559, 186 Ct.Cl. 142, 150 (1968).

3. The original contract price was ultimately increased to $106,790.59, as a result of various change orders. The notice to proceed was issued on August 12, 1970, and the contract performance period of 60 days began to run on August 24, 1970. By Change Order No. 1, dated September 16, 1970, but ostensibly negotiated by the parties on or about August 21, 1970, contract performance time was extended to 90 calendar days. Change Order No. 2, executed on July 20, 1971, granted plaintiff 30 additional calendar days for contract performance. Accordingly, plaintiff's contract performance time was 120 calendar days. Neither change order related to the circumstances underscoring the dispute now before the court.

4. The contract had designated a gravel bar site. However, at the request of plaintiff, the Forest Service allowed plaintiff to use another gravel bar site along the Mad River for filter source material.

5. Plaintiff had located a screening plant prior to bidding, but lost use of it because it did not put a deposit down to hold it. After receiving the contract, plaintiff had to search around for another screening plant to rent. Thus its screening plant operation was somewhat delayed.

In general, plaintiff's contract operations required the use of water for compacting earth, controlling dust, hydromulching,[6] and screening plant activities. Plaintiff anticipated that the Mad River, either from its surface or subsurface flow, would provide an adequate supply of water for contract operations. The Mad River was about 1.8 miles from the contract work site.

A small amount of rainfall (0.58 of an inch) was recorded in the Mad River watershed during the month of June 1970. No rainfall at all was recorded in this area for the months of July, August, September and up until it rained on October 19, 1970. It is to be noted the annual record rainfall in this area was greater for 1970, some 120 percent over normal, than it was for the four preceding years. This was due in large measure to the abnormal amount of rainfall which the area experienced in January 1970, a fact noted by plaintiff's hydrology expert. On September 28, 1970, the surface flow of the Mad River ceased. While not crystal clear from the record or the Board's findings, it would appear that the subsurface flow also ceased on September 28 or the following day at the latest. It is conceded that adequate quantities of water were not available to plaintiff from the Mad River for contract operations from September 28 until October 20, 1970, when rains on October 19 resorted the flow to the Mad River. The only contract operation which plaintiff emphasizes as being affected by the lack of water was the production of filter material by means of the screening plant. During this 22-day dry period, plaintiff hauled water to the screening plant site from other sources.[7]

Plaintiff, contending that the unavailability of water for 22 days constituted changed conditions, sought to recover $44,665.58, plus interest, at the administrative level. This amount, according to plaintiff, represents the additional costs and expense it incurred because of the unavailability of water. The Board in denying plaintiff's claim made no quantum determination.

II

The basic question before the Board was whether the lack of water in the Mad River during the period September 28, 1970—October 20, 1970, entitled plaintiff to an equitable adjustment under the Differing Site Conditions Article of the contract.[8] The Board found that the subsurface or latent physical conditions at the site did not differ materially from those indicated in the contract and thus a category one changed condition situation was not present. The Board also found that the unavailability of water in the Mad River during the period in question was the result of weather conditions and that such consequences, under the circumstances of this case, were not changed conditions under category two of the contract Article in question. The Board further found that the contract was silent as to any source of water needed for screening filter gravel and that the drought[9] con-

6. The contract required plaintiff to spray roadside slopes, in order to combat erosion, with a mixture of mulch, fertilizer and seed. This process was known as hydromulching.

7. Plaintiff, during this 22-day dry period, first obtained water from Barry Creek, which was about a mile or so upstream from the screening plant site. This source was exhausted in a short time and thereafter plaintiff hauled water from the Ruth Reservoir which was about 10 miles upstream from the plant site.

8. Article 4a—Differing Site Conditions, provided in pertinent part:
   "(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) Subsurface of [sic] latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. * * *"
Subpart (1) is referred to as a "Category One" changed condition and Subpart (2) is referred to as a "Category Two" changed condition. Both categories are involved in this case.

9. Webster's New International Dictionary, Second Edition Unabridged defines "drought" as "[d]ryness, want of rain or of water, esp. such dryness of weather or climate as affects the earth;" "a period of dryness, a dry spell, esp. when protracted."

dition complained of was not unexpected although its duration was not foreseeable.

■ Generally, the government, under the standard Differing Site Conditions Article, does not assume an obligation to compensate a contractor for additional costs or losses it incurs resulting solely from weather conditions, which neither party expected or could anticipate and not from any act or fault of the government. Weather conditions generally are considered to be acts of God. Neither party is obligated to the other for additional costs or price increases resulting solely from acts of God.[10] *Arundel Corp. v. United States*, 103 Ct.Cl. 688, 711–12 (1945), *cert. denied*, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945). Neither plaintiff nor defendant can be faulted in any way for the lack of flow in the Mad River at times material herein.

It is clear that the lack of surface and subsurface flow in the Mad River during the period September 28, 1970—October 20, 1970, resulted from inadequate rainfall in the river's watershed (*see* page 753, *supra*). The flow of the river and rainfall are so intertwined as to make it impossible to separate the river conditions from the weather. The record demonstrates clearly that weather was the dominant factor which actually determined the nature of river conditions during the period in issue. Weather, as indicated previously, is not a

risk which is shifted to defendant via the changed conditions clause. *Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364, 1370–71, 198 Ct.Cl. 472, 485–86 (1972).

—A—

In denying a changed conditions claim in *Arundel Corp. v. United States, supra*, 103 Ct.Cl. at 711–12, the court stated:

> * * * It is a general principle of law that neither party to a contract is responsible to the other for damages through a loss occasioned as a result of an act of God, unless such an obligation is expressly assumed. Here, the contract was silent in that regard and whatever loss plaintiff may have sustained must be borne by it, and not by the Government. * * * *[11]

There is no provision in this contract where the government expressly assumed the obligation to be responsible to plaintiff for all losses occasioned by an act of God. However, plaintiff maintains that the contract contained implied representations sufficient to come within the purview of Article 4a. While express representations as to the nature of conditions to be encountered during contract performance are not absolutely necessary to the establishment of a claim under category one of Article 4a, the contract documents must contain a reason-

---

10. The act of God doctrine cuts both ways. Application of the doctrine sometimes places the burden of increased costs on the government. *See e. g., Tacoma Dredging Co. v. United States*, 52 Ct.Cl. 447 (1917); *Carman v. United States*, 166 F.Supp. 759, 762, 143 Ct.Cl. 747, 752 (1958).

11. Plaintiff dismisses the *Arundel* case with the observation that the climatic conditions in that case occurred *after* the contract was formulated whereas in the case at bar the climatic conditions which led to the river drying up predated the execution of the contract. Plaintiff cites no authority in support of such a distinction. I intimate no opinion on the legal sufficiency of such a distinction (*but see Tombigbee Constructors v. United States*, 420 F.2d 1037, 1042–43, 190 Ct.Cl. 615, 625–27 (1970)) for the facts will not support the legal conclusion plaintiff seeks. The Board made no findings which would support plaintiff's assertion that operative climatic conditions predated the contract. Further, there is no substantial evi-

dence in the record to support such an assertion. The generalized statements of plaintiff's hydrology expert on which plaintiff ostensibly relies are most unpersuasive as other evidence in the record casts doubt on these generalizations. *See Sternberger v. United States*, 401 F.2d 1012, 1016, 185 Ct.Cl. 528, 535–36 (1968). The record indicates that at the time the contract was executed there was good flow in the river and the river manifested no evidence of a drought. Had it rained in August or September 1970 there presumably would have been continued flow in the river (*see* page 753, *supra*). Accordingly, it is not unreasonable to conclude that the lack of rainfall after the contract was entered into on July 31, 1970, was the significant fact in the cessation of river flow on September 28, 1970. This view is supported by the Board's observation, supported by substantial evidence, that the river flow resumed within a day after the rains began on October 19, 1970.

ably plain or positive indication that the conditions to be encountered would be other than those actually encountered at the time of performance, *Pacific Alaska Contractors, Inc. v. United States*, 436 F.2d 461, 469, 193 Ct.Cl. 850, 863–64 (1971).

Under category one of the Differing Site Conditions Article, a contractor may be entitled to an equitable adjustment if it finds conditions at the site materially different from those shown or indicated in the contract. Category one recovery will be denied if the contract documents do not "show" or "indicate" anything about the alleged changed condition. *United Contractors v. United States*, 368 F.2d 585, 595, 177 Ct.Cl. 151, 161 (1966).

■ Plaintiff suggests that the Forest Service warranted and guaranteed in the contract documents that the Mad River would provide sufficient water to plaintiff for contract operations. A reading of the contract documents will not support such a broad suggestion.[12] Plaintiff ostensibly recognizes this fact for it argues that its reading of various contract provisions led it to anticipate that water from the Mad River would be available to it throughout contract performance. Thus, plaintiff argues, the Forest Service at least implied a warranty that water from the Mad River would be available for contract purposes.

Plaintiff relies primarily on two contractual provisions in support of its implied warranty argument. The first provision, Item 215, relates to the location of gravel bars as a source for filter material and is set out at page 752, *supra*. This provision makes no mention of water and while it does reference the Mad River it does so only to indicate the location of filter material. One cannot reasonably read into this provision a warranty that water would be available for contract purposes.[13] See page 757 *infra*.

The second provision relied on by plaintiff is contained in Item 403 relating to hydromulching, *inter alia*. That provision, part 2.5, provides:

> *Water*—Water for hydromulching is available from the Mad River, 1.8 miles from the project. The Forest Service does not guarantee the source as to the quantity of water readily available.

Reasonably read, this provision cannot be interpreted as constituting a warranty by the Forest Service that water from the Mad River would be available for contract purposes. Plaintiff seeks to avoid the rather plain meaning of the second sentence of part 2.5, *supra*, by suggesting that "readily available" meant that in the case of a lack of surface water, water could always be mined from the subsurface flow of the river by special equipment.[14] Such a reading of "readily available" does not seem reasona-

12. Whether there are representations or indications in the contract that water would be available from the Mad River for contract work performance is a question of law, not of fact as perceived by plaintiff. Interpretation of contract documents is a judicial function. The court can differ from or agree with the Board in reading contract documents. *Arundel Corp. v. United States, supra*, 515 F.2d at 1123, 207 Ct.Cl. at 97; *United Contractors v. United States*, 368 F.2d 585, 596 n. 5, 177 Ct.Cl. 151, 162 n. 5 (1966).

13. Plaintiff reasons that filter source material would have to be screened and that this screening operation would require water. From this plaintiff concludes that the government warranted the availability of water at all pertinent times from the Mad River. Item 215 is not subject to such a broad interpretation. Plaintiff also sees support for his position in the testimony of a government witness who voiced

the opinion that the Mad River would be a logical choice for a contractor to plan on getting water needed for contract operations. However, in context, this opinion was based on the fact that the river was the nearest water source and was not based on the contract documents.

14. In its prebid site investigation, plaintiff learned that the Mad River dried up in the late summer or early fall months. However, it was led to believe from discussions with a local rancher that while the surface flow of the rivers would cease, subsurface flow would continue and could provide adequate water by mining operations. This information ostensibly formed the basis for plaintiff's reading of part 2.5 of Item 403. There is no evidence in the record as to whether the costs of the special equipment necessary to mine the subsurface water were included in plaintiff's bid.

ble under the circumstances of this case. It seems more reasonable to interpret "readily available" to mean that while the Mad River was the closest (1.8 miles) water source, it usually dried up in the late summer or early fall months and a contractor might have to use water from other sources not readily available, e. g., the Ruth Reservoir some 10 miles away. See Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551, 195 Ct.Cl. 21, 30 (1971). This interpretation seems more compatible with a reasonably intelligent person acquainted with the contemporary circumstances. Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975, 169 Ct.Cl. 384, 388 (1965). The clear thrust of the second sentence of part 2.5, supra, certainly militates against finding that the Forest Service guaranteed that water would be available at all times from the Mad River for contract operations. Finally, it is noted that water was available to plaintiff from the Mad River for hydromulching operations required by the contract. No claim is made that plaintiff's hydromulching operations were affected by a lack of water from the Mad River. Accordingly, a relevant reading of part 2.5 establishes no contract violation. Plaintiff's effort to read the hydromulching specification into the filter material specification seems most strained.[15]

▪ In further support of its claim for category one changed conditions, plaintiff claims to have relied to its detriment on a Forest Service map (designated in the record as plaintiff's exhibit A) of the Six Rivers National Forest. Plaintiff contends that this map, which contained a solid blue line indicating the Mad River, represented

that the Mad River has a perennial flow. The map plaintiff relies upon was not provided to it as part of the contract package, nor was it in any way referenced in the contract documents. It was not made available to plaintiff for the specific use of this project. As such it cannot be fairly viewed as a reasonably plain or positive indication in the contract documents sufficient to support a claim under category one of Article 4a. See Pacific Alaska Contractors, Inc. v. United States, supra, 436 F.2d 461, 193 Ct.Cl. at 863–64. In any event the Board's decision, supported by substantial evidence, found that this map was not a reliable basis for determining matters relating to the flow of the Mad River. Indeed, plaintiff's expert so testified. The map in question was a visitor's map of the forest made available to the general public for informational purposes. Mr. Robinson, who prepared plaintiff's bid, testified that he acquired the map from the Forest Service because he was unfamiliar with the job site area. Moreover, while plaintiff relies on the solid blue line as indicating perennial flow, which plaintiff interprets to mean continuous availability of water, the United States Geological Survey in its booklet, "Topographic Maps" explains the solid blue line symbol in pertinent part as follows: "Water features are printed [on maps] in blue and are generally classified as either perennial or intermittent. Perennial water features contain water most of the year (except for infrequent and extended periods of drought), and are shown by solid lines. Intermittent water features contain water only part of the year and are indicated by broken lines * * *"[16] Accordingly, it was unreasonable for plaintiff to read the

15. Plaintiff also references other sections of the contract, e. g., Supplemental General Provisions, 6300–42, but does not clearly identify the provisions it relies on or explain their significance. I have reviewed the 6300–42 provisions in entirety and cannot find in them any indication therein which could be construed as implying a warranty by the government that water from the Mad River would be available at all times for contract performance purposes.

16. There are a number of maps of the area in question in the record and confusion and conflict in the record as to whether perennial or

intermittent flow is reflected on said maps. This fact serves to further support the Board's finding that maps, of the kind in the record, are not reliable indicators of water availability at any particular time in any river. Parenthetically, the contract did contain a blow-up portion of a map of the area designed to provide location of the project information to prospective bidders. This blow-up portion map, in black and white, did not contain any solid blue line representing the Mad River and thus did not contain any perennial flow information.

solid blue line as indicating that water would always be available to it for contract performance. Perennial flow indications are not a warranty that water will always be available from a river so designated. To the extent that plaintiff relied on the above-mentioned visitor's map in interpreting the contract, it did so at its peril.

The construction and interpretation plaintiff seeks to place on various provisions of the contract to the effect that the Forest Service impliedly warranted the availability of water in the Mad River during the period of contract performance in September—October 1970 is not within the "zone of reasonableness." *Bishop Eng'r Co. v. United States*, 180 Ct.Cl. 411, 416 (1967). Moreover, it would be unreasonable to expect the Forest Service to warrant and guarantee the availability of water, either surface or subsurface, from the Mad River for contract performance during the months of September—October because it was well known in the locality that the Mad River usually dried up for some period of time during the late summer and early fall months. *See Bateson-Stolte, Inc. v. United States*, 305 F.2d 386, 389, 158 Ct.Cl. 455, 459–60 (1962). The assumption by the government of the risks of acts of God, by way of payment of increased costs to a contractor occasioned by such acts, must be established by clearer and more definitive language than is present in the contract here in question. *Lenry, Inc. v. United States*, 297 F.2d 550, 553, 156 Ct.Cl. 46, 53 (1962).

There were no express representations nor were there any positive indications in the contract documents that would induce reasonable bidders to believe that water would be available from the Mad River at all times during the late summer and early fall months for contract performance. Accordingly, there were no changed conditions within the meaning of category one of the Differing Site Conditions Article. *Pacific Alaska Contractors v. United States, supra*, 436 F.2d at 469, 193 Ct.Cl. at 863–64; *compare with Beacon Constr. Co.*, ASBCA No. 7675, 1963 BCA ¶ 3677.

■ The above discussion also supports the Board's conclusion that "whether this water was available immediately adjacent to the screening plant or whether this was water to be hauled from other sources such as the Ruth Reservoir was a matter to be resolved by TEI [plaintiff]." Indeed, Robinson, plaintiff's vice president and bid estimator, testified that nothing in the contract said it had to use water from the Mad River. Merely because the Mad River is in the area of the contract work site does not justify finding a warranty that water from said river would be available for plaintiff's use at all times during contract performance absent contract provisions establishing such a warranty. *See Lenry, Inc. v. United States, supra. See also Chris Berg, Inc. v. United States*, 389 F.2d 401, 182 Ct.Cl. 23 (1968); *compare with S. S. Mullen, Inc. v. United States*, 389 F.2d 390, 182 Ct.Cl. 1 (1968).

I agree with the Board that a category one changed condition has not been established.[17]

17. Board finding No. 7, which merely recited verbatim the grounds on which the contracting officer denied the claim, without independent record support for said grounds, states, *inter alia*, that plaintiff never considered washing the filter material or the availability of water in the Mad River prior to preparing its bid and that plaintiff believed it could meet specifications without washing or screening. Plaintiff attacks such statements as well as other statements contained in finding No. 7. Since the record is conflicting on several points set forth in said finding, the manner in which the Board placed these matters in its finding No. 7 makes it difficult to discern whether these matters were found as substantive facts or were recited merely to show the basis for the contracting officer's decision. Under such circumstances, no consideration is given to matters covered by finding No. 7. *See Southwest Welding & Mfg. Co. v. United States*, 413 F.2d 1167, 1184–85, 188 Ct.Cl. 925, 954 (1969); *Dean Constr. Co. v. United States*, 411 F.2d 1238, 1245, 188 Ct.Cl. 62, 74–75 (1969). *See also McKee v. United States*, 500 F.2d 525, 528, 205 Ct.Cl. 303, 310 (1974). Further, some statements in finding No. 7 are legal and not factual conclusions. As such, they are not entitled to Wunderlich Act finality in any event. Rejection of this Board finding, however, does not affect the conclusions reached herein.

—B—

Plaintiff also seeks recovery under category two of the Differing Site Conditions Article, *supra,* (see page 753 note 8). Generally, a category two changed condition claim embraces questions of fact. Accordingly, Board findings relative to what site conditions existed at the time the contract was entered into and thereafter are usually questions of fact which are entitled to finality unless subject to the derogatory language of the Wunderlich Act, *supra. Arundel Corp. v. United States, supra,* 515 F.2d at 1123, 207 Ct.Cl. at 97–98. The category two changed conditions on which plaintiff premises its claim, *i. e.,* the lack of surface and subsurface flow in the Mad River during the period September 28—October 20, 1970, were the result of weather conditions and thus were properly considered by the Board to be acts of God and not within the coverage of said article. *See* pages 753–754, *supra.*[18]

The Board observed that, "[t]he drought condition experienced in 1970 was not unexpected although its duration was not foreseeable." There is substantial evidence in the record supporting this statement.

Plaintiff was aware, as a result of its prebid investigations, that the Mad River usually dried up in the late summer—early fall months. It was told by a local rancher that the surface flow of the river usually dried up for 2 or 3 days but that subsurface flow, obtainable through mining efforts, could produce available water for contract operations. Accordingly, it was foreseeable that annual drought conditions could result,

as found by the Board, during short periods of time when the surface flow of the Mad River would cease. Plaintiff concedes this point. *See Fort Sill Associates v. United States,* 183 Ct.Cl. 301, 307 (1968).

Plaintiff's case rests on the subsurface flow of the river which plaintiff assumed, on the basis of its conversations with the local rancher, would always provide available water regardless of surface drought. Information on the subsurface flow of the Mad River is sparse in this record. No recorded data, with any official status, as to subsurface flow is available in the record. Instead, there is generalized and hearsay statements and opinions as to what one might expect by way of subsurface flow during short periods of surface drought.

As to plaintiff's reliance on the rancher's information that subsurface mined water in the riverbed could provide adequate water for plaintiff's contract needs, the Board found that this information did not specify a quantity of water such as plaintiff required to operate its screening plant.[19] The record supports this finding although the Board failed to state any definitive conclusion or inference which might follow from such a finding.

A rational explanation, in context, of the rancher's information as to the adequacy of water for contract performance by plaintiff would appear to be that subsurface water might be available for some period of time, *e. g.,* 2 or 3 days after a surface drought. Accordingly, what the rancher told plaintiff might well have been correct as to droughts

18. The record indicates rather clearly that the Mad River had good flow when the contract was entered into. Indeed, plaintiff, during its site investigation was worried about floods and not drought because the river was flowing so great. It was not until early or mid-September that reduction in the flow of the river was noticed. On this record, the only reasonable fact to be drawn is that drought conditions did not exist when the contract was entered into, a finding which the Board, perhaps inarticulately, made. Plaintiff, as it did before the Board, continues to seek category two relief on the premise, which it failed to establish, that drought in question predated the execution of the contract. It has not, however, established

a predicate for such a premise. *See* page 754 note 11, *supra.*

19. Plaintiff testified he related his water needs to the rancher. However, in his testimony he never described, *in haec verba,* what it was he related to the rancher. Further, there is no evidence as to whether the rancher appreciated what a screening plant was, how much water it used, etc. There is no basis in the record on which one could reach a conclusion that plaintiff's reliance on what the rancher, who was not a witness in the case, told him about available subsurface water during surface droughts was reasonable relative to plaintiff's water needs.

of 2 or 3 days. Had the rancher, on whom plaintiff relied so heavily in his prebid investigation, testified he may well have indicated also that subsurface water would not be available if the drought were 3 or more days. In considering the information which the rancher supplied plaintiff as to subsurface flow during surface drought periods, it must be remembered that the drought in issue was unprecedented, unanticipated, and unforeseeable in duration. That is the significant point here.[20]

The Board found that plaintiff made a reasonable site investigation, a fact emphasized by plaintiff. That site investigation revealed a heavy flowing river. On this record, it is not unreasonable to assume a good subsurface flow existed as well although there is no definitive evidence in the record on the matter. That condition, which existed at the time of the execution of the contract, did not reflect drought conditions. The drought condition occurred on September 28, 1970, almost 2 months after execution of the contract. Under such facts, the Differing Site Conditions Article will not support a changed conditions claim. See Arundel Corp. v. United States, 96 Ct.Cl. 77, 116 (1942). This situation is to be contrasted with the situation present in Briscoe v. United States, 442 F.2d 953, 194 Ct.Cl. 866 (1971), upholding a changed condition claim found by an administrative board, where the condition, a pond from which the contractor anticipated obtaining water for use in contract performance, existed on the day the contract was executed but was not later available to the contractor during contract performance because the third-party owner of the pond refused to allow the contractor to use water therefrom. Plaintiff relies heavily on the Briscoe case but its reliance is misplaced. In addition to the distinction between this case and Briscoe evident in the discussion, supra, it is to be observed that Briscoe was not an act of God situation but instead involved, in essence, a man-made condition. Briscoe involved acts of the government and of the third-party pond owner which related to the efforts of the contractor to utilize, as it anticipated at the time of bid and contract execution, pond water for contract performance.[21] On the Briscoe facts, a finding of changed conditions was understandable. See Hoffman v. United States, 340 F.2d 645, 651, 166 Ct.Cl. 39, 49 (1965). Such a finding is not permissible on the facts present in this case.

The record clearly supports the Board's conclusion that the duration of the drought was unforeseeable. The record also discloses, and there is no dispute about the fact, that the drought of 22 days was not anticipated nor expected by either party. It seems further agreed that the duration of the drought was unprecedented. Plaintiff argues that because of the unprecedented nature of the drought, a category two changed condition existed. Case law will not support plaintiff's argument. Where climatic conditions produce unexpected, unanticipated and unprecedented weather conditions which affect contract performance, such weather conditions, deemed to be acts of God, generally are not within the purview of the Differing Site Conditions (changed conditions) Article. See pages 753–754 supra; Banks Constr. Co. v. United States, 364 F.2d 357, 371, 176 Ct.Cl. 1302, 1325 (1966) (abnormal rainfall); Car-

20. The record indicates that plaintiff was able to obtain subsurface water, after the river dried up, at various points for several days. Perhaps this is precisely the situation the rancher had in mind when he talked with plaintiff. Neither plaintiff nor anyone else, on this record, anticipated a 22-day drought period.

21. In this case the government was in no way responsible for the drought conditions. On the other hand, the Board found, in essence, that had plaintiff promptly rented and assembled its screening plant it may have been able to manufacture a stockpile of filter material before the drought set in on September 28, 1970, and thus have avoided the impact of the drought on its screening operations. Substantial evidence is present in the record to support the Board's findings of delay on plaintiff's part in the obtaining and assembling of the screening plant. However, whether plaintiff would have been able to stockpile sufficient quantities of filter material to avoid completely the impact of the drought on its screening operations, absent any delay referred to above, is, on this record, speculative in nature.

man v. United States, 166 F.Supp. 759, 762, 143 Ct.Cl. 747, 751–52 (1958) (severe flood); *Warren Bros. Roads v. United States*, 105 F.Supp. 826, 828, 123 Ct.Cl. 48, 79 (1952) (unusual quantities of rain); *Arundel Corp. v. United States, supra*, 103 Ct.Cl. 688 (unanticipated hurricane); *Barnard-Curtiss Co. v. United States*, 257 F.2d 565, 568 (10th Cir. 1958), *cert. denied*, 358 U.S. 906, 79 S.Ct. 230, 3 L.Ed.2d 227 (1958) (an unprecedented and extraordinary flood of unusual proportions); *but see Bosen & Dybevik Constr. Co.*, AGBCA No. 243, 69–1 BCA ¶ 7581 [22] and *compare with Concrete Constr. Corp.*, IBCA No. 432, 65–1 BCA ¶ 4520.

Plaintiff has failed to show that it encountered a category two changed condition. The Board's determination to this effect was correct in fact and law. The drought conditions plaintiff complains about resulted solely from extended dry weather conditions which can properly be classified as an act of God.

**22.** Plaintiff relies heavily on the *Bosen* decision in which the Board (AGBCA) held that unforeseeable subsurface water conditions that resulted directly from unprecedented rainfall, constituted a changed condition. The Board cautioned in *Bosen* that abnormal rainfall in and of itself is not a changed condition and that the particular and unique facts led it to find a subsurface changed condition in that case. The Board (AGBCA) in this case distinguished *Bosen*, rather cavalierly, as factually different although the legal proposition as advanced by the Board in *Bosen* seems to have some relevancy to the facts in this case. In any event, the narrow legal holding in *Bosen* seems contrary to the act of God (weather) cases in this court. *See* particularly *Arundel Corp. v. United States*, 103 Ct.Cl. 688, 711–12 (1945), *cert. denied*, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945). I would not subscribe to the legal proposition suggested by the Board in *Bosen* that, absent circumstances of party involvement or fault relative to the condition itself, unforeseeable subsurface water conditions resulting solely from unprecedented rainfall constitute a changed condition under the standard Differing Site Conditions Article.