**PORTABLE ROCK PRODUCTION COMPANY, INC.**

v.

**The UNITED STATES.**

No. 655–81C.

United States Claims Court.

Jan. 31, 1984.

Robert G. Taylor, Seattle, Wash., atty. of record, for plaintiff. Taylor & Bryan, Seattle, Wash., of counsel.

Michael A. Gordon, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Randall B. Weill, David M. Cohen and Thomas W. Petersen, Washington, D.C., of counsel.

OPINION

SPECTOR, Senior Judge.

This case arises out of a contract between plaintiff and the United States Forest Service, Department of Agriculture, for construction of the so-called Moonlight Timber Sale Roads in the Willamette National Forest, Lane County, Oregon. The petition (now complaint) sets forth seven causes of action seeking recovery of $158,355 under General Provisions 3 ("Changes") and 4 ("Differing Site Conditions") of the contract; and, in the alternative, under breach of contract theories. As the direct result of subsurface water conditions encountered on the project, allegedly misrepresented by defendant, plaintiff claims it experienced substantially increased costs in all phases of its construction work, including log decking, excavation, slash and brush removal, placement of subgrade reinforcement and placement of cushion materials.

The contract provisions cited by plaintiff to support its claims provide in pertinent part as follows:

General Provision 3. Changes

(a) The Contracting Officer may, at any time, * * * by written order * * * make any change in the work within the general scope of the contract * * *.

*　　*　　*　　*　　*　　*

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work * * * an equitable adjustment shall be made and the contract modified in writing accordingly * * *.

General Provision 4. Differing Site Conditions

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) Subsurface or latent physical conditions at the site differing materially from those indicated in this contract or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or

decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.

\* \* \* \* \* \*

Evidence addressed to these issues was developed at a four-day trial in Portland, Oregon, April 12 through 15, 1983.[1]

### Statement of Facts

The construction to be performed under this contract consists of about two miles of relatively unsophisticated forest access roads. The so-called "upper road" (.63 miles) was to be constructed along a high ridge and it presented no problem relevant to this case. It is mentioned solely for purposes of comparison. In contrast, the "lower road" (1.37 miles) was constructed along the base of that same ridge, at its juncture with the flood plain of the Willamette River. That is where the water problems occurred, as hereinafter described.

It was originally planned that the roads would be constructed as part of a timber sale, with the Government extending a credit to the purchaser against the purchase price of the timber to cover the cost of constructing the access roads. That plan was abandoned when the credit offered was deemed insufficient. The timber sale did, however, provide this plaintiff with an earlier opportunity to walk the alignment of the roads and to evaluate any difficulties to be encountered. Thereafter on October 24, 1979, the Forest Service solicited bids for a so-called "public works" project directed solely to construction of the roads. Bids were to be submitted on a unit-price, estimated quantities basis.[2] The work to be performed consisted of construction staking, clearing and grubbing, excavation, embankment, hauling, installation of culverts and a perforated underdrain, and the placement of an aggregate base or surface course.

After bids were opened on November 26, 1979, the low bidder ($297,033.76) alleged an error in its estimate and was permitted to withdraw. On December 17, 1979, award was made to plaintiff as the next lowest bidder in the amount of $336,311.04.[3] The bulk of the work was subsequently subcontracted by plaintiff to Willamette Crushing Company on April 8, 1980 for $225,000.[4] Representatives of both plaintiff and Willamette, its subcontractor, were present at a pre-construction meeting on March 18, 1980 to discuss this contract.

After consulting with plaintiff, the Forest Service issued plaintiff a notice to proceed with the work on April 4, 1980. At plaintiff's request, the Forest Service on April 21, 1980 then suspended all work due to wet ground conditions. The suspension was lifted effective May 19, 1980, and it was then partially reinvoked on June 2, 1980.[5] A notice to fully resume the work was issued on June 10, 1980, and the subcontractor, Willamette, began working on the lower road on July 1, 1980. By July 11, 1980, Willamette had confirmed to plaintiff by letter a prior verbal notice of its claim based on alleged differing site conditions and defective specifications. The claim was passed on by plaintiff to defendant's contracting officer, and on July 15, 1980, For-

---

1. The record consists of the testimony of 14 witnesses in 880 pages of transcript, together with 61 trial exhibits.

2. Under this form of contract, payments are adjusted to coincide with the quantity of work of each type actually performed, at the applicable unit prices.

3. The Forest Service had estimated $301,-892.06.

4. Plaintiff states that it sublet "all items of work on the project with the exception of crushed rock" to Willamette. The latter was therefore plaintiff's *alter ego* for most purposes.

5. The felling of timber and some other clearing operations were permitted to proceed.

est Service and Willamette representatives met to examine the work areas in question.[6]

On another related claim indirectly attributed to the same wet conditions, Willamette complained to plaintiff on August 4, 1980 because of its alleged inability to burn right-of-way slash on the roadway, as required by the contract. It cited weather and fire restrictions. The contract requirement for burning within the right-of-way was claimed to be a defective specification. This claim was likewise forwarded to the contracting officer by plaintiff. On August 13, 1980, following on-site discussions, the Forest Service authorized removal of the slash to another location less than a mile away for later burning.[7]

The contract required the work to be completed in 210 working days. It was actually completed by plaintiff in less time, namely, in about 151 working days.

### Additional Facts and Argument Offered by Plaintiff

Representatives of Willamette examined the project and ground conditions a total of three times, including the earlier-mentioned examination when construction of the roads was first proposed as part of a timber sale. Willamette's manager saw nothing on that occasion which concerned him on the lower road, with respect to water or related problems that he might encounter. When the project was readvertised as a public works project, Willamette's estimator again reviewed the site and noted a bog area as "(j)ust a big hole with water in it, really. It was * * * there was water setting there definitely. I had to * * * there were trees, and things, laying over the area, so that I

could get across without getting wet." He could "definitely not" drive his vehicle across it. The bog was, in his testimony, "150 to 200 feet long."

In additional testimony addressed to what he had seen in reviewing the site and examining the contract documents, Willamette's representative also acknowledged that he was aware of the drainage system which had been designed for the bog area.[8] He was also aware of "a couple of small streams crossing the road in a couple of places."[9] He did not think the terrain "was going to present that much of a problem for us * * *."

Willamette's representative did not read a contract provision requiring two feet of subgrade reinforcing on top of the final excavation grade, and before installation of base course work, as any indication of anticipated water problems.[10] Two other witnesses offered by plaintiff were of the same opinion.

Plaintiff avers that it had not intended to use the entire 210 days allowed for performance of the work, but rather estimated that it would start working about June 1, 1980 and finish in 90 to 100 days.[11] With regard to earlier-mentioned suspensions of the work due to wet ground conditions[12], plaintiff's witness testified that he was "pressured" by the Forest Service to commence work on June 10, 1980, and that the ground was too wet to hold equipment until July 1, 1980.

It is further claimed, based on climatological data for Eugene, Oregon (40 miles from the project) and for Oakridge Airport (15

---

6. There is inconclusive evidence that plaintiff agreed on this occasion that there were no differing site conditions.

7. Burning of slash was completed by February 6, 1981. The contract work had previously been inspected, and it had been accepted October 9, 1980, subject only to later disposition of slash.

8. As specified in the contract, the drainage system consisted of 117 lineal feet of perforated pipe placed on the uphill side of the road with a

culvert at the end of the pipe draining it across the road.

9. Reference is to plaintiff's brief, page 4.

10. He testified: "The only thing I could think of in my walk through there was that the soils probably weren't up to par where it would hold a subgrade; therefore you put a couple feet of subgrade reinforcing in there."

11. As noted earlier, plaintiff finished in 151 days.

12. See text at notes 5 and 6, supra.

miles from the project) that the total rainfall at the project site for June 1980 was 3.12 inches which, it is further claimed, exceeded the "annual" average rainfall for western Oregon. As a result, it is submitted, the Forest Service was obliged to issue a change order under General Provision 3, "Changes", above quoted, for an additional 29 feet of perforated pipe and an additional 18-inch corrugated metal pipe.

The previously described bog area in the front half of the project [13] is said to have been "close to 300 feet long and 5 or 6 feet deep." And the ground conditions encountered there were described as "extremely wet and soft causing the equipment to settle down into the mud." The back part of the project, in comparison, "was soft, it slowed things down, but Willamette Crushing was still able to progress some." [14] Plaintiff describes percolating water "in the vicinity of the bog." A change order under General Provision 3, "Changes", required removal of approximately 3 feet of material in the bog area, and its replacement with crushed rock. Wet conditions also delayed log decking. [15] Plaintiff's testimony was that Willamette's efficiency "was 50 to 60% of what had been anticipated." It is argued that the issuance of the above-described change orders "reveals that the Forest Service either miscalculated the location of the source of the water or chose not to design a proper water system to handle the percolating water that was bubbling up in the middle of the roadway during construction."

With respect to plaintiff's claim regarding the contract requirement for slash and brush cleanup, by burning within the right-of-way, plaintiff argues that it originally intended to perform this cleanup during May and June. When water conditions prevented the start of work until July, on-site burning was too dangerous because of the risk of forest fire. Then, after plaintiff

was offered several options in lieu of burning on the right-of-way, as required by the contract, "(o)nly one of these options was economically or physically reasonable. * * The Forest Service refused to compensate Willamette Crushing for this extra work."

Plaintiff contemplated placing the subgrade reinforcing starting at the end of the roadway, and working back toward the beginning. This plan was frustrated by the soft and spongy condition of the ground, thus requiring placement of subgrade reinforcing from the front end of the project toward the back. As a result, equipment was being driven over previously placed subgrade reinforcing, described as an "extremely rough surface due to the size of the rock. It just slowed everything down." [16]

The contract required placement of a 3-inch cushion over the subgrade reinforcing, and Willamette requested permission to place the cushion as the subgrade reinforcing was being placed, to "enable Willamette Crushing trucks to drive over the rock more efficiently." The requested permission was allegedly refused.

All of the foregoing complaints are attributed directly or indirectly to wet ground conditions which plaintiff claims it did not anticipate. Its ultimate argument is that the Forest Service had knowledge of the wet ground conditions to be encountered, which it did not volunteer to bidders. Government witnesses who examined the right-of-way prior to designing the project characterized the soil as clay loam, and anticipated that "(s)ubsurface drainage is probably the most significant problem associated with this area. Because of its *low topographic position,* it has a periodically high water table that restricts the use of septic tanks for sewage disposal and limits the options available for road location and design * * *." (Emphasis supplied.) [17]

---

**13.** *See* text preceding note 8, *supra.*

**14.** Quotes are from plaintiff's brief, unless otherwise indicated.

**15.** Storage of logs along the right-of-way, for later removal.

**16.** Transcript, page 397.

**17.** Transcript, page 436.

Other documents obtained by plaintiff during discovery contained reports indicating "that the material quality varies from poor to fair for use as subgrade material. This factor, coupled with a periodic high water table and high erosion potential, *indicates the need for a reinforced subgrade. We plan on importing suitable material to reinforce the subgrade* on the lower road. (Emphasis supplied.) [18]

Plaintiff also refers to a memorandum describing the results of a pre-bid soil investigation conducted by the Forest Service. The lower road is described therein as:

> * * * a *low* elevation road with minimum grades *in the old stream plain of the upper middle fork of the Willamette River in old stream deposits and glacial till. The route crosses a bench under the flood plain to Station 40 plus 05 where it* intersects the stiff blue clay of minor thickness. The rest of the line *runs along the toe of the upper slope and intersects slope drainage* at Stations * * * [seven different locations listed]. These crossings which are flowing streams, pose no significant problems, but those that appear as springs or seeps will result in minor cutback failures and require *extra attention to subgrade reinforcement and drainage.* It is therefore recommended that the line be constructed with minimum cuts, and that each wet area encountered be drained with a filter cloth, wrapped gravel filter, around a perforated pipe on the uphill side and lead off with a solid pipe. In addition, all cut slopes used should show the one to one or flater [sic] with a wide ditch for cleanup. Numerous alluvial type deposits along the route will need to be cut back in this process, and they should be checked to insure that any sumps or ponds on them are drained by trenches. [Emphasis supplied.] [19]

An intra-Government letter produced on discovery also described the lower road as "situated at the slope toe, and immediately adjacent to the Middle Fork of the Willamette River." It concluded that:

> The road traverses terrain that has an extremely high water table, which leads to the possibility of a saturated base for building embankment on. The control allowed by the subject specifications will enable us to achieve a properly constructed subgrade.

Plaintiff's complaint is, apparently, that the plans and specifications did not specifically indicate the possibility of a saturated base for building embankment.

### Additional Facts and Argument Offered by Defendant

The Forest Service, aware that wet ground conditions would be encountered in constructing the lower road, specially designed the road to anticipate those conditions. In order to adjust for any variations in the quantity of work to be performed under this unit-price contract, the following provision was contained in the contract:

*30.3 Altered Quantities*

(a) When the quantity of work to be done or material to be furnished under any pay item of the contract is increased to more than 125 percent of the original contract estimated quantities, then either party to the contract, upon demand, may be entitled to an equitable adjustment on that portion of the work above 125 percent of the original contract quantities.

(b) When the quantity of work to be done or material to be furnished under the pay item of the contract is reduced to less than 75 percent of the original contract quantities, then either party to the contract, upon demand, may be entitled

---

**18.** Note that this plan was in fact implemented by the contract requirement for a deep, reinforced subgrade along the entire lower road.

**19.** These recommendations were essentially adopted in the contract requirements as they were advertised for bids. Culverts were provided at "crossings which were flowing streams"; subgrade reinforcement was in fact specified; and drainage was provided in the form of perforated pipe, and a ditch, where deemed necessary.

to an equitable adjustment for the quantity actually performed and accepted.

\* \* \* \* \* \*

The variations in quantity of the unit-priced items of work were in fact relatively minor, and there was therefore no need to invoke this provision. The very few change orders issued were only for items not priced in the original contract.

In anticipation of wet conditions, the design for the lower road called for one to two feet of subgrade reinforcing (consisting of clean shot rock) along its entire length, plus the installation of 15 culverts, 117 feet of perforated underdrain connected to a transverse 40-foot culvert, and the formation of deep, wide drainage ditches. These are all devices commonly employed to conduct surface run-off, standing water, and subsurface seepage across a roadway. The ditches served to lower the water table and featured flat slopes designed to keep water away from the road. This ditch design and the extensive use of subgrade reinforcing are expensive and unusual design features not usually found in Forest Service road construction contracts. Defendant denies that it refused plaintiff permission to place the final 3-inch cushion over subgrade reinforcing as the latter was being placed, provided that the subgrade reinforcing was first placed in accordance with the contract.

Subsurface water problems are not uncommon on road construction projects in the Willamette National Forest. They are normally corrected with perforated pipe and replacement of wet soil, as was done here. In fact, contract specification 203.06, *Utilization of Excavated Materials,* provided under subdivision (c), *Conserving Material,* that: "*Excessively wet material* [emphasis supplied] which is otherwise suitable for embankment will be field drained and dried before placement."

The one to two feet of reinforced subgrade specified here was a clear indication of unstable soil conditions. In contrast to the upper road, the design of the lower road was significantly different, indicating a low-strength subgrade, unstable in the presence of water. This should have alerted a knowledgeable contractor, aware of the location and topography of the lower road, to the presence of ground water and wet ground conditions. Moreover, all data used by the Forest Service in developing the design for these roads was available to all prospective bidders.

Weather conditions in the Willamette National Forest are unpredictable, and June can be a wet month. Plaintiff was not "pressured" to work in June, as alleged. The requested suspension was lifted, indicating only that the contract time was beginning to run again. In any event, plaintiff never used all the contract time available to it. Most types of soil are unstable when wet, including the clay loam soil present here. Subsurface water is generally found close to the surface at the juncture of a slope and a flood plain where this road was to be built.

The type of vegetation which grew along the alignment of the lower road (namely, ferns, red cedar, vine maple, "horse tails", and skunk cabbage) was a further indication of extremely wet ground conditions.

Neither plaintiff nor its subcontractor Willamette chose to attend a pre-bid conference to which all prospective bidders were invited. At such conferences, the drawings and specifications are reviewed, questions are answered, and tours of the project site are conducted for those interested. Instead, Willamette and plaintiff relied on their own knowledge of the area, and their three surveys of the site.[20]

The lower road was actually built substantially as it was originally designed, and the few changes in the drainage structures were relatively minor. The road is satisfactory as designed, and that design resolved the water problems encountered during

---

20. Willamette had in fact encountered wet conditions on steeper, higher ground when constructing another Forest Service road in that vicinity back in 1978, and found it necessary to replace unsuitable material with shot rock on that occasion. In this case, similar treatment was required, by design, for the entire length of the lower road.

construction, permitting construction to proceed at all times.

With respect to the disposal of slash and brush, burning within the right-of-way was required to preserve recreational and environmental values in the vicinity. At no time did the Forest Service agree to provide burn bays outside of the lower road for disposition of construction slash. Following an inspection on August 11, 1980, the Forest Service concluded that slash could be burned on the roadway as contemplated by the contract. Neither plaintiff nor Willamette requested a burning permit to dispose of slash on the roadway. To accommodate Willamette, the Forest Service offered several acceptable alternative methods, provided they did not result in increased cost or time. Willamette selected the alternative of hauling to a designated site about one-half mile from the project, for burning at a later date.

### Discussion

Neither the facts above summarized, nor the contract provisions cited by plaintiff, nor the law applicable in such cases, support plaintiff's claims. Treating initially with the contract provisions upon which plaintiff relies, General Provision 3, "Changes", earlier quoted, anticipates that there will be some changes in the work, within the general scope of the contract. It is a rare construction contract indeed which does not demonstrate the need for a reasonable number of changes as the work progresses. That is the obvious purpose for which the "Changes" provision was designed. Its non-use on a project of this type would be unusual.

As a matter of fact, the "Changes" provision was used relatively few times on this contract. Compensation for any increase in cost resulting from issuance of the few change orders mentioned in the record was reflected in the change orders themselves. Moreover, this was a unit-price, estimated quantities contract. Variations in the estimated quantities were inevitable, since the quantities of work to be performed were merely estimates to begin with. Compensa-

tion for any variation in those estimates was automatic, at the unit prices specified, without even the need for a change order, unless the variations exceeded the limits specified in the above-quoted contract provision 30.3, "Altered Quantities". The minor variations encountered did not exceed those limits. In summary, the roads were built and paid for essentially as they were designed, with only those minor changes and variations which one would reasonably expect on a project of this type.

If, on the other hand, plaintiff is urging that the issuance of a few changes constitutes evidence that "Differing Site Conditions" under General Provision 4 were encountered, that argument is not persuasive. The latter provision contemplates by the language "whether or not *changed* [emphasis supplied] as a result of such conditions" that the discovery of "differing site conditions" may on occasion *result* in the issuance of a change order because the site conditions encountered are so different than anticipated that the project can no longer be built as it was originally designed. But that is not to say that the mere issuance of minor change orders pursuant to a routine exercise of the "Changes" clause thereby establishes the existence of "Differing Site Conditions" under General Provision 4.

■ Plaintiff's main contention is obvious. It is claimed that in constructing the lower road, essentially as it was designed, plaintiff encountered unanticipated wet conditions which were (in the words of the "Differing Site Conditions" article) "(1) (s)ubsurface or latent physical conditions at the site *differing materially from those indicated in this contract* or (2) unknown physical conditions at the site, of an unusual nature, *differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.*" (Emphasis supplied.)

Neither of those types of different conditions were in fact encountered. Given the topography at the project site, the location of the lower road at the intersection of the

toe of a slope with the flood plain of a river, the obvious design of the road to meet anticipated water conditions, other indications of water in the contract provisions, the typical reaction of most soils to wet conditions, and the nature of the vegetation in the vicinity, all observable from an examination of the contract plans and specifications and/or a visual examination of the site [21], plaintiff should have known the conditions to be expected and actually encountered. Nor were these conditions "unknown" and "of an unusual nature" for work of this character. One does not have to be professionally trained in the science of soils mechanics to know that most soils, when exposed to atmospheric, surface, or subsurface water, at this type of location, will become relatively unstable and uncompactible, in short, mud. It was not necessary that the Forest Service after setting forth all the other indications of wet conditions which it provided in the contract documents, go on to state the obvious conclusion to be drawn from those indications, namely, that wet conditions would be encountered.

■ Nor did the Forest Service withhold essential information which was peculiarly within its knowledge so as to give rise to a claim of breach of contract based on non-disclosure.[22] The evidence shows that the Forest Service reflected all the data it had in the design itself, which it then published in the contract documents, for the benefit of all bidders. Moreover, that underlying data was readily available for examination by any prospective bidder for comparison with the contract data furnished and the bidder's own observations of the project site.

Plaintiff asserts that 210 days were allowed in the contract for performance of this project, but that it anticipated finishing in only 90 to 100 days. Since it actually took 151 days to complete the work, these figures are offered to demonstrate a loss of efficiency resulting from "differing site conditions". But those figures demonstrate quite the contrary. They illustrate that the job was finished well ahead of schedule; that there was no "pressure" from the Forest Service to commence work earlier than plaintiff wanted to, and if "pressure" was felt by plaintiff, that pressure was self-imposed; and that the conditions at the site did not differ appreciably from those reasonably to be anticipated, thus permitting the work to be finished ahead of schedule.

The principal case cited by plaintiff in support of its claims[23] involved different facts, and granted relief only with respect to about 10 percent of the project which involved those different facts. In all other respects, plaintiff's claims were denied in that case. As to the portion supporting a finding of differing site conditions, the facts were totally different. An important survey report was developed by the Government but was then not used to any significant degree in designing the project, although that survey report described some troublesome subsurface conditions otherwise hidden from prospective bidders examining the site.[24] In contrast, all survey data developed by the Government in the present case was readily available to pro-

---

21. Plaintiff asserts it examined the site on three separate occasions.

22. Contrast *Potashnick v. United States,* 123 Ct.Cl. 197, 105 F.Supp. 837 (1952), a case in which defendant's engineers had developed extensive data from a subsurface survey of the site, which was not truthfully recorded on the drawing furnished to prospective bidders, resulting in a holding that "defendant concealed from plaintiff material information relating to subsurface conditions and gave plaintiff erroneous and misleading information on the boring-data drawing upon which plaintiff relied in making his bid. The representations made by defendant on the core-boring data drawing were a warranty, and the knowledge and concealment from plaintiff of facts and information relating to the true character of the subsurface conditions in the area involved amounted to a misrepresentation, and constituted a breach of warranty and of the contract." 123 Ct.Cl. at 218, 105 F.Supp. 837.

23. *Nelson Bros. Construction Co.,* AGBCA No. 393, 77–2 BCA ¶ 12,660 (1977); 79–1 BCA ¶ 13,726 (1979). *See also,* same case at 225 Ct.Cl. 703 (1980).

24. In this respect, the facts resembled those in *Potashnick,* note 22, *supra.*

spective bidders and was, moreover, faithfully employed in the design of the lower road. There is no evidence that prospective bidders were misled either by affirmative misrepresentations, or by a failure to disclose data peculiarly within the knowledge of the Forest Service. There were certainly no indications in the contract documents that wet conditions would *not* be encountered, or that bidders could expect to perform the work under dry conditions.

To the extent that plaintiff's "differing site conditions" claims is predicated on weather conditions, the simple answer is that the weather conditions described were not unusual or unexpected in that locality and at that time of year. But even if weather conditions were shown to have been unusually severe and unforeseeable, that would not support a claim for relief under the "Differing Site Conditions" clause.[25]

The facts in this case bear some resemblance to those in *Banks Construction Co. v. United States*[26], a case in which plaintiff sued to recover extra costs attributed to alleged misrepresentations in defendant's plans as to the drainage capacity of existing ditches, with the result that the area became saturated from abnormal rainfall. It was held that the contract documents contained no misrepresentations concerning the drainage capacity of the ditches; that plaintiff could and should have ascertained their capacity by an adequate pre-bid site inspection and a careful study of the contract documents; and that plaintiff's difficulties were caused by its own underestimate, and by abnormal rainfall.

*See also Christensen Construction Co.,* AGBCA No. 81–165–3[27]; *Powell's General Contracting Co.,* DOT CAB No. 1088[28]; and *Dempsey Engineering Co.,* AGBCA No. 78–119[29].

All of the foregoing considered, plaintiff has shown neither a contract claim under the "Differing Site Conditions" provision, nor a claim for breach of contract based on alleged non-disclosure of superior information, exclusively within the defendant's knowledge.[30]

Plaintiff's remaining claims for disposal of right-of-way slash, and for an alleged refusal of permission to place cushion material over the subgrade reinforcement, are also without merit. To the extent that they are attributed to differing site conditions, it has been concluded that such conditions were not encountered. Independently of that conclusion, the slash disposal claim is for the cost of work clearly required by the contract. When plaintiff declined to dispose of slash in the manner required by the contract, it was offered a panoply of alter-

---

**25.** *See,* for example, *Arundel Corp. v. United States,* 103 Ct.Cl. 688, *cert. denied,* 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945). *See also, Turnkey Enterprises v. United States,* 220 Ct.Cl. 179, 597 F.2d 750 (1979), where contractor *expected* subsurface water and failed to encounter *enough* water to satisfy its needs, because of a *drought.*

**26.** 176 Ct.Cl. 1302, 364 F.2d 357 (1966).

**27.** 81–2 BCA ¶ 15,329. A claim that a deep muck hole constituted a differing site condition was denied because a reasonable inspection of the area would have revealed those conditions, which were readily apparent from even a limited investigation of the site.

**28.** 80–2 BCA ¶ 14,680. The inability of the contractor to use a contractually designated spoils area was held not to be a differing site condition, because the contractor's site inspection was found to be inadequate. He examined only part, and not all, of a haul road for wet conditions and those wet conditions frustrated his contemplated use of 30-ton trucks. Encountering wet conditions in the excavation of peat, which has a high water content, is to be expected. The contract documents did not describe the conditions to be encountered, and wet conditions were discoverable from a reasonable site inspection.

**29.** 80–1 BCA ¶ 14,235. A contractor's claim for additional compensation attributed to differing site conditions was denied because the contract documents made no representations as to subsurface conditions to be encountered, and there was no showing that the conditions actually encountered were materially different from known and usual conditions. In working a few hundred feet from a river bed, the contractor was responsible for preventing the accumulation of water in the excavation.

**30.** *Cf. Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774 (1963).

natives, one of which it freely chose. There is no valid claim for extra work on those facts.

Similarly, with respect to the placement of cushion material, the record shows that the Forest Service did not refuse permission to place cushion material over the reinforced subgrade, as an aid to movement of equipment over the rough subgrade. The permission refused was a request by Willamette to mix dirt with the subgrade to facilitate its placement, and to place the cushion material before the subgrade had been approved.

### Conclusion

Plaintiff is not entitled to recover, and its petition shall be dismissed.